**UNITED STATES of America, Appellee,**

v.

**PROGRESSIVE FARMERS MARKETING AGENCY, Appellant.**

**No. 85–1719.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1986.

Decided April 15, 1986.

Rehearing and Rehearing En Banc Denied June 24, 1986.

---

James T. Malysiak, Chicago, Ill., for appellant.

Asher E. Schroeder, Sioux City, Iowa, for appellee.

Before HEANEY and BOWMAN, Circuit Judges, and HANSON *, Senior District Judge.

HANSON, Senior District Judge.

This is an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) from the decision of the district court denying appellant's motion for summary judgment. The court held that the appellee's security interest in the debtor's hogs was not extinguished by

the sale of the hogs through the debtor's agent, the appellant in this action. On appeal, the appellant asserts that the district court erred when it ruled that a livestock marketing agency is not entitled to the protection of the U.C.C. § 9–307(1), arguing that the U.C.C. provides that when the hogs were transferred to a marketing agency they became inventory and were no longer farm products. We reverse.

From 1977 to 1980 Darrell M. Newman and JoAnn Newman, Ida County, Iowa hog farmers, executed a series of promissory notes with the Farmers Home Administration (FmHA). The FmHA filed a financing statement with the Recorder of Deeds of Ida County on August 9, 1971, and with the Secretary of the State of Iowa on September 2, 1971. Continuation statements were filed with the Secretary of the State of Iowa on March 30, 1976 and May 15, 1981.

From July to November of 1981, Progressive received from the Newmans on consignment a total of 153 head of hogs in four different transactions. Progressive received possession of the hogs at the Sioux City Stockyards and thereafter sold the hogs, as agent for the Newmans, to buyers in the ordinary course of business. Pursuant to 9 Code of Federal Regulations § 201.43, Progressive made prompt payment and accounting to the Newmans for these livestock sales, remitting a total of $14,980.85, for which Progressive earned a commission of $168.35. During all of these transactions neither Progressive nor the purchasers of these hogs were aware of the FmHA lien against the Newmans' hogs or the proceeds thereof. When the FmHA learned of these transactions, it demanded that Progressive account for the value of the hogs. Progressive refused to do so, and the FmHA filed the instant suit.

In denying Progressive's motion for summary judgment in its May 7, 1985 order, the district court held that it would not relieve Progressive of liability for conversion. The court noted:

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

[T]he practical effect of ruling for the defendant is that a farmer-debtor would be given the unilateral power to extinguish a secured party's perfected security interest in farm products by choosing a particular method of marketing. If the farmer chose to sell his hogs through a marketing agency, the secured creditor would not have rights in the collateral once it was in the hands of the third parties. * * * Alternatively, if the farmer chose to sell his farm products directly to the buyer, the security interest would continue in the hogs and the secured party would have enforcible rights in the hogs even though they were processed to the extent of being pork chops on a grocery shelf.

The court, although recognizing the inherent harshness of its ruling on marketing agencies and auctioneers, asserted that, on balance, the equities lean in favor of the secured party in cases such as this.

In *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Supreme Court held that the federal government's priority rights are decided by federal law, but that the state law—the U.C.C.—applies to determine priority conflicts between the federal government and private lenders if no federal law has set the priorities. *Id.* at 740, 99 S.Ct. at 1464–65. Because there was no federal law in effect at the time of the alleged conversion as to the liability of commission merchants to the FmHA for selling mortgaged farm products,[1] the content of the federal rule is determined by incorporating state law. *See United States v. Public Auction Yard*, 637 F.2d 613, 616 (9th Cir. 1980); *United States v. Southeast Mississippi Livestock Farmers Ass'n*, 619 F.2d 435, 436–37 (5th Cir.1980); *United States v. Friend's Stockyard, Inc.*, 600 F.2d 9, 10 (4th Cir.1979).

Until July 1, 1985, Progressive's liability for conversion of the debtor's hogs was governed by an interpretation of the interplay between the farm products exception in Iowa Code § 554.9307(1) and the definition of "farm products" and "inventory" set out in §§ 554.9109(3) and (4). Section 554.9307(1) provided that:

(1) A buyer in ordinary course of business (subsection 9 of Section 554.1201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

The key issue on this appeal is whether the hogs were "inventory" or "farm products." The district court found that Progressive, as the marketing agent for the debtors, was liable for the conversion of the hogs just as if the debtors had sold the hogs directly to the buyers without using the intervening agent. The difficulty with the district court's rationale for imposing liability on Progressive is that it does not square with the intent of the U.C.C. to alter the definition of the collateral at issue when it comes into the hands of the commission merchant. Official Comment 4 of 9–109 states:

When crops or livestock or their products come into the possession of a person not engaged in farming operations they cease to be "farm products." If they come into the possession of a marketing agency for sale or distribution or of a manufacturer or processor as raw materials, they become inventory.

The district court was troubled with the application of this change in the nature of the collateral because it believed that this would enable the farmer-debtor to extinguish the security interest in farm products simply by choosing to sell his goods through a commission merchant rather than selling directly to the buyer himself. The court found that when it balanced the equities of forcing the commission merchant to search the U.C.C. records at the

---

1. For a discussion of the Food Security Act of 1985, clarifying that commission merchants, after December 23, 1986, will not be liable against holders of perfected security interests in farm products, see *infra* p. 6–7.

office of the Secretary of State for outstanding liens, as opposed to forcing the secured party to police its outstanding loans, public policy seemed to lean in favor of protecting the secured party. However, the holding of the district court is difficult to rationalize in light of the express language set out in Comment 4 of § 554.9109. It appears that the drafters of the U.C.C. contemplated the kind of problems that would arise when collateral comes into the hands of commission merchants by providing that they are outside the farm products exception.

Moreover, the Iowa legislature has squarely confronted the issues in this case by clarifying that it did not intend to include within the farm products exception commission merchants by its amended § 554.9307(1), effective July 1, 1985. The revised statute states:

(1) Except as provided in subsection 4, a buyer in ordinary course of business as defined in § 554.1201, subsection 9, takes free of a security interest created by that person's seller even though the security interest is perfected. For purposes of this section, a buyer or buyer in ordinary course of business includes any commission merchant, selling agent, or other person engaged in the business of receiving livestock as defined in section 189A.2 on commission for or on behalf of another.

Section 554.9307(4)(a) states in pertinent part:

(4)(a) A buyer in ordinary course of business buying farm products from a person engaged in farming operations

takes free of a security interest created by that person's seller even though the security interest is perfected, unless the buyer receives prior written notice of the security interest, or unless the buyer purchases the farm products outside of the seller's trade area, or the buyer's principal place of business is located outside of the seller's trade area. The "seller's trade area" consists of the county in which the seller resides or a county that is contiguous to or corners upon the county where the seller resides.  * * * 2

Although the revised statute may not be applicable in this case because the statute became effective after the district court had rendered its opinion,[3] there can be little doubt that these changes reflect the prevailing public policy of the State of Iowa. Indeed, it appears that more than one third of the states, including many major agricultural states, have altered their commercial codes within the last three years to address the growing dissatisfaction with the farm products exception. *See* Uchtmann, Bauer & Dudek, "The U.C.C. Farm Products Exception—A Time to Change," 69 Minnesota Law Review 1315, 1315–16 nn. 3–4 (1985).[4] These changes have been brought about because of the problems caused by the farm products exception and the need to provide greater protection to the buyers of farm products. These statutes eliminate the harsh result contemplated by the district court of transforming buyers and commission merchants into sureties on the farmers' debts.

---

**2.** In this case the "seller's trade area" provision is met in that Ida County, the Newmans' county of residence, is contiguous to Woodbury County, Iowa, the county where Progressive does business.

**3.** According to Iowa Code § 4.5 (1985), a statute is presumed to be prospective only unless expressly made retrospective. However, if the statute relates solely to a remedy or procedure, it is ordinarily applied both prospectively and retrospectively. *State ex rel. Leas in Interest of O'Neal,* 303 N.W.2d 414, 419 (Iowa 1981). Procedural law "is the practice, method, procedure, or legal machinery by which the substantive law is enforced or made effective." *State ex rel.*

*Turner v. Limbrecht,* 246 N.W.2d 330, 332 (Iowa 1976). Although we do not so rule today, it would appear that the amendment to Iowa Code § 554.9307(1) is procedural, and therefore would be applicable to this case.

**4.** Uchtmann, Bauer, and Dudek provide an especially comprehensive overview of the law as it relates to the farm products exception. Their careful study makes it apparent that the farm products exception is of dubious continued vitality. *See* Uchtmann, Bauer & Dudek, "The Farm Products Exception—A Time to Change," 69 Minn.L.Rev. 1315, 1325 (1985).

If the changes made by the Iowa legislature were not enough to establish the public policy in favor of protecting commission merchants from liability for outstanding security interests, the Court also takes judicial notice that Congress in the Food Security Act of 1985, Pub.L. No. 99–198, § 1324(g), 99 Stat. 1354 (Dec. 23, 1985), provided that commission merchants or selling agents who sell in the ordinary course of business "shall not be subject to a security interest created by the seller in such farm product even though the security interest is perfected and even though the commission merchant or selling agent knows of the existence of such interest." Although the Food Security Act provisions will not be effective until December 23, 1986, the changes made by Congress further aid the Court in establishing public policy. There can be little doubt that Congress intends, in its repeal of the farm products exception, to allocate the loss resulting when a borrower defaults on the farm products lender.

In light of the statutory changes made by the Iowa legislature and the Congress, as well as what appears to have been the original intent of the drafters of the U.C.C. as set out in Comment 4 of § 9–109, the public policy in the instant case is well-settled. It is not for this Court to rebalance the equities in order to determine what public policy should apply. Although there is no doubt that the district court did not have the advantage of these subsequently enacted legislative materials, its judgment nonetheless must be reversed and remanded.